**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
<u>Plaintiff-Appellee,</u>

v.

RICHARD ANTHONY MORGAN, a/k/a
Zaheer Lewis, a/k/a Paul S. Lyttle,

a/k/a Lawrence S. Lewis, a/k/a
Zarie Lewis, a/k/a Joey Lewis, a/k/a
Paul Stone, a/k/a Scott Lewis, a/k/a
Lewis Lawrence, a/k/a Scott
Lawrence, a/k/a Scott Larece,
<u>Defendant-Appellant.</u>

No. 99-6245

Appeal from the United States District Court
for the District of South Carolina, at Florence.
Cameron McGowan Currie, District Judge.
(CR-98-428)

Argued: May 3, 1999

Decided: September 21, 1999

Before WILKINS, NIEMEYER, and TRAXLER, Circuit Judges.

_____

Vacated and remanded by published opinion. Judge Traxler wrote the
opinion, in which Judge Wilkins and Judge Niemeyer joined.

_____

**COUNSEL**

**ARGUED:** William Fletcher Nettles, IV, Assistant Federal Public
Defender, Florence, South Carolina, for Appellant. John Michael Bar-

ton, OFFICE OF THE UNITED STATES ATTORNEY, Columbia, South Carolina, for Appellee. **ON BRIEF:** J. Rene Josey, United States Attorney, Alfred W. Bethea, Jr., Assistant United States Attorney, Florence, South Carolina, for Appellee.

_____

**OPINION**

TRAXLER, Circuit Judge:

Richard Anthony Morgan ("Morgan"), who has been hospitalized at the United States Medical Center for Federal Prisoners in Springfield, Missouri ("Springfield") since the district court found him incompetent to stand trial on various federal firearms and narcotics charges, appeals from an order permitting Springfield medical personnel to forcibly treat him with antipsychotic medication. Although the determination that Morgan should be forcibly medicated was reached in the context of an administrative proceeding conducted pursuant to Federal Bureau of Prisons ("BOP") regulation 28 C.F.R. § 549.43 (1998), Morgan challenges the validity of that determination by alleging that the procedural safeguards delineated in§ 549.43 did not adequately protect his substantive and procedural rights under the Due Process Clause of the Fifth Amendment. For those rights to receive adequate protection, he contends, the determination of whether to forcibly medicate him must be made in the first instance by a district judge in the context of an evidentiary hearing.

Because we conclude that the proceedings below satisfied the requirements of due process, we reject Morgan's position that he was constitutionally entitled to an evidentiary hearing before a district judge. We believe, however, that Morgan might be entitled to relief from the administrative determination because Springfield medical personnel acceded to his request that a correctional officer serve as his staff representative in the § 549.43 proceeding. In so doing, Springfield medical personnel may have contravened their affirmative obligation under 28 C.F.R. § 549.43(a)(2) to ensure that Morgan was assisted by a staff representative with sufficient education and experience to understand the psychiatric issues involved in the proceeding. Because the record on appeal provides no indication that the correc-

2

tional officer in question had the requisite credentials, we vacate the district court's order and remand for factual findings as to whether he did indeed have those credentials and, if not, whether Morgan suffered prejudice in the administrative proceeding as a result.

I.

In April 1998, the government filed a three-count indictment charging Morgan with conspiring to possess with intent to distribute cocaine base, see 21 U.S.C.A. §§ 841(a)(1) (West 1981) and 846 (West Supp. 1998), using and carrying a firearm during and in relation to a drug trafficking crime, see 18 U.S.C.A. § 924(c)(1) (West Supp. 1998), and being a felon in possession of a firearm, see 18 U.S.C.A. § 922(g)(1) (West Supp. 1998). After Morgan was taken into custody, the district court ordered a psychiatric evaluation on his competency to stand trial. See 18 U.S.C.A.§ 4241(b) (West 1985). Morgan was then admitted to Springfield, evaluated by Dr. James K. Wolfson ("Dr. Wolfson"), and discharged.

Dr. Wolfson prepared a report in connection with his evaluation of Morgan, reciting the various assessments made of Morgan by him and by other Springfield medical personnel. In particular, Morgan insisted that he had no memory of events occurring before November 1997 because his body was then taken over by a spirit named "Ja'ai," and that he was therefore the son of Haile Selassie, the late Ethiopian Emperor.[1] Morgan advised that the name "Ja'ai" was spelled using the letter "J" followed by a pyramid containing an eye, as appearing on the reverse side of a one-dollar bill. In that regard, Morgan occasionally called himself "the third eye on the Egyptian Pyramid." J.A. 32. Morgan often spoke to or screamed at no one in particular, and stated that he was "`sometimes controlled by spirits.'" Id. Although Morgan's speech was sometimes slow and conversational, he routinely launched into lengthy episodes of preaching Rastafarian doctrine, during which the speed, volume, and intensity of his speech increased considerably. Morgan denied suicidal intent apparently on the basis of his belief that the world would die if he were to die, but did

_____

[1] Followers of Rastafarianism venerate Haile Selassie as a god. See Merriam Webster's Collegiate Dictionary 968 (10th ed. 1997).

3

threaten to commit suicide when informed that he would be transferred to a different cell.

Although Dr. Wolfson had not yet diagnosed Morgan's precise mental disorder at the time he prepared Morgan's competency report, he had concluded that Morgan suffered from a "psychotic psychiatric illness." J.A. 41. This illness, Dr. Wolfson opined, prevented Morgan from having a rational understanding of the proceedings against him or from assisting his counsel. Accordingly, Dr. Wolfson concluded that Morgan was incompetent to stand trial. Dr. Wolfson recommended that Morgan be treated with antipsychotic medication, but noted that Morgan had so far refused to consider the treatment despite his best efforts to convince him of its potential utility.[2]

Upon reviewing Dr. Wolfson's report, the district court conducted a hearing to determine Morgan's competency to stand trial. See 18 U.S.C.A. § 4241(c). The court ultimately found by a preponderance of the evidence that Morgan was suffering from a mental disease or defect rendering him mentally incompetent to the extent that he was unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense. See id. § 4241(d). In light of that finding, the district court committed Morgan to the custody of the Attorney General for hospitalization and treatment. See id. Morgan was thereafter returned to Springfield.

A.

After Dr. Wolfson's efforts to obtain Morgan's consent to treatment with antipsychotic medication proved futile, Springfield medical personnel initiated an administrative proceeding under 28 C.F.R. § 549.43, which the BOP enacted to govern the determination of whether an inmate who "will not or cannot provide voluntary written informed consent for psychotropic medication" may nevertheless be so treated. Id. § 549.43(a); see Control, Custody, Care, Treatment and

_____

[2] The effect of antipsychotic medication, which is also referred to as "psychotropic" medication, "is to alter the chemical balance in the brain, the desired result being that the medication will assist the patient in organizing his or her thought processes and regaining a rational state of mind." Washington v. Harper, 494 U.S. 210, 214 (1990).

4

Instruction of Inmates; Administrative Safeguards for Psychiatric Treatment and Medication, 57 Fed. Reg. 53,820 (1992) (codified at 28 C.F.R. §§ 549.40 to 549.43). Specifically,§ 549.43 authorizes forcible treatment with antipsychotic medication when institutional medical personnel find that such treatment "is necessary in order to attempt to make the inmate competent for trial or is necessary because the inmate is dangerous to self or others, is gravely disabled, or is unable to function in the open population." 28 C.F.R. § 549.43(a)(5).

In addition to designating the circumstances under which an inmate may be forcibly medicated, § 549.43 directs that institutional medical personnel provide an inmate with a variety of procedural safeguards. See id. § 549.43(a)(1)-(8). In that respect, Springfield medical personnel scheduled Morgan for an administrative hearing, see id. § 549.43(a), and issued him a form providing"24-hour advance written notice of the date, time, place, and purpose of the hearing, including the reasons for the medication proposal," id. § 549.43(a)(1). The form also advised Morgan of procedural rights that he would have during the hearing, including the right to appear, to present evidence, to be represented by a staff member, to call witnesses, and to request that witnesses be questioned. See id. § 549.43(a)(2). The form did not, however, inform Morgan that a staff representative would be appointed for him if he did not request one or if he requested one who lacked sufficient experience or education. See id. ("If the inmate does not request a staff representative, or requests a staff representative with insufficient experience or education, the institution mental health division administrator shall appoint a staff representative."). Morgan eventually requested Les Dye ("Dye"), a Springfield correctional officer, to be his staff representative. Springfield medical personnel honored this request by formally appointing Dye to represent Morgan.

Dr. Charles D. Glazzard ("Dr. Glazzard") conducted the administrative hearing, which Morgan attended. Also present at the hearing were Dr. Wolfson, in his capacity as Morgan's treating psychiatrist, and Dye, in his capacity as Morgan's staff representative. Although the hearing was not recorded, Dr. Glazzard prepared a report following the hearing. Pursuant to 28 C.F.R. § 549.43(a)(4), Dr. Wolfson presented "clinical data and background information relative to the need for medication." J.A. 67. As paraphrased in Dr. Glazzard's report, Morgan testified as follows: "`I do not want to take medica-

5

tion. Medicine makes you crazy. It makes you work and causes pain in the muscles.'" Id. at 134. Moreover, Morgan apparently made several references to the Bible and "postured, raising his arms in a semi-religious fashion." Id. at 136. He also repeated phrases and did not respond directly to questions, leading Dr. Glazzard to note in his report that "[i]t was not clear whether he understood or not." Id. Dr. Glazzard further noted that Morgan expressed concern regarding side effects of antipsychotic medication.

It appears that the testimony of Dr. Wolfson was the only psychiatric evidence submitted at the hearing. Other than Morgan's statements, no evidence was presented on his behalf. Nor does the record reflect that the testimony of Dr. Wolfson was questioned in any way. Rather, it appears that Dye's participation, in his capacity as Morgan's staff representative, was limited to testifying that "Mr. Morgan while interacting with others sings and talks inappropriately in the third person referring to himself as Ja'ai." Id. at 134.

Dr. Glazzard ultimately determined that Morgan should be forcibly treated with antipsychotic medication. In support of this determination, Dr. Glazzard found, among other things, that such treatment is necessary because Morgan is dangerous to himself and to others at Springfield, and necessary to render him competent to stand trial. Dr. Glazzard explained in his report that Morgan's thoughts "make him a potential danger to himself and others because of misunderstandings and impulsive responses." J.A. 137. He further explained that "antipsychotic medication is the only form of medical treatment that might help [Morgan] improve to be able to return to court." Id. Although noting that Morgan had requested Dye to be his staff representative, Dr. Glazzard did not address whether Dye had sufficient education or experience to serve as a staff representative. See 28 C.F.R. § 549.43(a)(2).

Morgan received a copy of Dr. Glazzard's report, which advised him of his right to submit an administrative appeal within 24 hours and to have the appeal decided within 24 hours of submission. See id. § 549.43(a)(6). The report did not, however, advise Morgan of his right to request the assistance of his staff representative in preparing and submitting the appeal. See id. ("Upon request of the inmate, the staff representative shall assist the inmate in preparing and submitting

6

the appeal."). Nevertheless, Morgan submitted an appeal to Sherman Waltner ("Waltner"), the Associate Warden at Springfield. In several rambling sentences, Morgan challenged Dr. Glazzard's determination that he should be forcibly medicated.

B.

In the interim between the administrative hearing and the issuance of Dr. Glazzard's report, Morgan's counsel moved in the district court to enjoin Springfield medical personnel from forcibly medicating Morgan pursuant to Dr. Glazzard's determination. Counsel argued that the Due Process Clause of the Fifth Amendment required that the determination of whether to forcibly medicate Morgan had to be made by a district judge in the context of an evidentiary hearing. Counsel relied primarily upon United States v. Brandon , 158 F.3d 947 (6th Cir. 1998), in which the Sixth Circuit concluded that a non-dangerous pretrial detainee, whom institutional medical personnel sought to forcibly treat with antipsychotic medication solely to render him competent to stand trial, was constitutionally entitled to greater protection than that offered by the administrative procedures delineated in 28 C.F.R. § 549.43. Specifically, the court held that due process prohibits such an individual from being forcibly medicated unless a district judge conducts an evidentiary hearing and finds by clear and convincing evidence that such treatment "is the least restrictive and least harmful means of satisfying the government's goal . . . of rendering [the individual] competent to stand trial." Brandon, 158 F.3d at 960.

After Dr. Glazzard issued his report, the district court denied Morgan's motion for an evidentiary hearing, holding that Morgan was not constitutionally entitled to the type of judicial determination prescribed by the Sixth Circuit in Brandon. In so ruling, the district court concluded that the matter was governed by United States v. Charters, 863 F.2d 302 (4th Cir. 1988) (en banc), in which this court held that the determination of whether to forcibly medicate a pretrial detainee found to be incompetent to stand trial and dangerous to himself and to others was best left to the professional judgment of institutional medical personnel and subject to judicial review only for arbitrariness. Because Dye did not assist Morgan in preparing and submitting his administrative appeal, however, the district court directed that Morgan be permitted to supplement the appeal with such assistance.

7

See 28 C.F.R. § 549.43(a)(6). If decided adversely to Morgan, the court indicated, it would then conduct the arbitrariness review under Charters.

C.

Morgan subsequently prepared and submitted a supplement to his administrative appeal with Dye's assistance. The supplement, as did the original appeal, consisted of several rambling sentences. In particular, Morgan expressed his concern regarding side effects of antipsychotic medication. He also contested Dr. Glazzard's finding that he posed a danger to himself or to others at Springfield, noting that he had not injured himself nor anyone else while hospitalized. Lastly, he claimed that he was "not crazy" and was"ready to face the charges." J.A. 130.

After reviewing Morgan's administrative appeal, including the supplement, Waltner issued Morgan a written decision upholding the determination that he should be forcibly medicated. Waltner first set forth his finding that Morgan received all mandated procedural safeguards. See 28 C.F.R. § 549.43(a)(6). Thereafter, relying upon Dr. Glazzard's report, Waltner noted that antipsychotic medication "was indicated as the only effective treatment intervention which was likely to modify your thought disorder to the extent that you could be restored to the level of competency necessary to cooperate with counsel in preparing a defense and to understand the proceedings against you." J.A. 129. Moreover, Waltner stated that"as a preventative measure, we must assume that you pose a potential risk to staff," a conclusion that he supported by referring to the violent nature of the pending charges against Morgan and to Morgan's "anger and animosity" toward those who proposed that he be treated with antipsychotic medication. Id. Such animosity, Waltner found,"appears superficially to be rooted in the delusional symptoms you exhibit." Id.

The district court, upon conducting a review of the record, found that Springfield medical personnel complied with§ 549.43 and that the administrative determination that Morgan should be forcibly medicated was not reached arbitrarily. The court therefore entered an order authorizing Springfield medical personnel to forcibly medicate Morgan pursuant to the administrative determination. Morgan then

8

appealed from the order to this court. We granted Morgan's motion for expedited consideration of the appeal and the district court has since stayed its order pending our disposition.

II.

We first address whether we may properly exercise jurisdiction over Morgan's appeal. Under 28 U.S.C.A. § 1291 (West 1993), a federal court of appeals has jurisdiction over all "final decisions" rendered by a district court. Section 1291 entitles a party to appeal not only from a decision "that ends the litigation on the merits and leaves nothing more for the court to do but execute the judgment, but also from a narrow class of decisions that do not terminate the litigation, but must, in the interest of achieving a healthy legal system, nonetheless be treated as final." Digital Equip. Corp. v. Desktop Direct, Inc., 511 U.S. 863, 867 (1994) (internal citations and quotation marks omitted); see Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 546 (1949) ("This decision appears to fall in that small class which finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated."). In order to fall within the latter category, the decision under review must "conclusively determine the disputed question, resolve an important issue completely separate from the merits of the action, and be effectively unreviewable on appeal from a final judgment." Coopers & Lybrand v. Livesay, 437 U.S. 463, 468 (1978); see Cohen, 337 U.S. at 546.

Because the order from which Morgan appeals satisfies the foregoing conditions, we may properly exercise jurisdiction under § 1291. Specifically, the order authorizes Springfield medical personnel to forcibly medicate Morgan pursuant to the administrative determination reached under 28 C.F.R. § 549.43. The district court entered the order upon finding that Springfield medical personnel complied with § 549.43 and that the administrative determination was not reached arbitrarily. Before conducting this analysis, the district court concluded that due process did not require that the determination of whether to forcibly medicate Morgan be made in the first instance by a district judge, thus rejecting the framework prescribed by the Sixth Circuit in Brandon. Since the district court has not indicated an intent

9

to revisit this ruling before the medication is administered, the order has conclusively determined the disputed question.

The district court's order also resolved an important issue that is completely separate from the merits of the underlying firearms and narcotics charges asserted in the government's three-count indictment. Indeed, our determination of whether Morgan has received the procedural safeguards to which he is entitled before being forcibly medicated will have no bearing upon the ultimate question of whether he is guilty or not guilty of those offenses.

Lastly, the district court's order would be effectively unreviewable on appeal from a final judgment of conviction. Once Morgan has been forcibly medicated pursuant to the order, a determination of the procedural safeguards to which he was entitled prior thereto would amount to a purely academic exercise.

Accordingly, we may properly exercise jurisdiction over Morgan's appeal under § 1291. We now proceed to the merits.

III.

Our analysis of the procedural issue raised in the present appeal begins with an examination of our decision in Charters, upon which the district court primarily relied in its disposition below, and the post-Charters decision of Washington v. Harper, 494 U.S. 210 (1990), in which the Supreme Court rejected a due process challenge to a procedural regime authorizing institutional medical personnel to forcibly medicate a state prison inmate. We shall then determine whether the procedural safeguards employed in the present matter adequately protected Morgan's due process rights, considering his argument that we should adopt the Sixth Circuit's approach in Brandon.

A.

Charters involved a pretrial detainee found to be incompetent to stand trial and dangerous to himself and to others. At the request of Charters' treating psychiatrist, the district court permitted institutional

10

medical personnel to forcibly treat Charters with antipsychotic medi-
cation, concluding that his interests were adequately protected by the
exercise of their professional judgment. See Charters, 863 F.2d at
305. Charters appealed, contending that under the Due Process Clause
of the Fifth Amendment, the determination of whether to forcibly
medicate him had to be made by a district judge in the context of an
evidentiary hearing.

We observed that Charters retained a constitutionally protected lib-
erty interest in refusing treatment with antipsychotic medication. See
id. at 305-06. We further observed that this retained interest "must
yield to the legitimate government interests that are incidental to the
basis for legal institutionalization," id. at 305, but is nevertheless pro-
tected "against arbitrary and capricious actions by government offi-
cials," id. at 306. We then undertook the task of determining the
procedural protection to which Charters was entitled under the Due
Process Clause.

After first acknowledging the "undoubtedly sensitive nature of the
individual liberty interest at stake," id. at 307, we examined the proce-
dural framework employed by the government in determining
whether to forcibly medicate an inmate. We noted that this framework
placed "responsibility for making the base-line governmental decision
to medicate in the appropriate medical personnel of the custodial
institution." Id. Deeming the decision to forcibly medicate an inmate
as essentially "medical" in nature, we found protection against error
"first, in the general professional competence and integrity of the gov-
ernment's medical personnel, and second, in the availability of judi-
cial review to guard against arbitrariness in making particular
decisions." Id. at 307-08. We found that such a regime may comport
with the requirements of due process "notwithstanding the absence of
any adversarial adjudicative element." Id. at 309.

Ultimately, we concluded that the existing framework, under which
the determination of whether to forcibly medicate an inmate was left
to the professional judgment of institutional medical personnel and
subject to judicial review only for arbitrariness,"[was] adequate, if
properly administered, to comply with due process requirements." Id.
at 312; see id. ("Making an acceptable professional judgment of the

11

sort here in issue does not require any internal adversarial hearing."). We thus declined to adopt the procedural regime urged by Charters.

B.

While Charters was pending before the Supreme Court on a petition for a writ of certiorari, the Court decided Harper, which involved a state prison regulation providing that an inmate who suffered from a mental disorder and who posed a likelihood of serious harm to himself, to others, or to their property, could be forcibly treated with antipsychotic medication. After Harper was forcibly medicated pursuant to the regulation, he brought suit under 42 U.S.C.A. § 1983, claiming that due process required that the determination of whether to forcibly medicate him be made by a judge after an evidentiary hearing.

The Supreme Court first established that Harper possessed "a significant liberty interest in avoiding unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment." Harper, 494 U.S. at 221-22. The Court noted, however, that the validity of a prison regulation claimed to infringe upon a fundamental constitutional right of an inmate is determined by inquiring "whether the regulation is `reasonably related to legitimate penological interests.'" Id. at 223 (quoting Turner v. Safley, 482 U.S. 78, 89 (1987)). Applying this rational-basis standard of review, the Court observed, reconciles "adherence to the principle that inmates retain at least some constitutional rights despite incarceration with the recognition that prison authorities are best equipped to make difficult decisions regarding prison administration." Id. at 223-24.

The Court ultimately upheld the regulation and, in so doing, concluded that "the Due Process Clause permits the State to treat a prison inmate who has a serious mental illness with antipsychotic drugs against his will, if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest." Id. at 227. The Court first found the regulation to be a rational means of furthering a legitimate interest. In particular, the Court recognized "the legitimacy and the importance" of the government's interest in controlling dangerous prison inmates. Id. at 225; see id. ("There are few cases in which the State's interest in combating the danger posed by a person

12

to both himself and others is greater than in a prison environment, which, by definition, is made up of persons with a demonstrated proclivity for antisocial criminal, and often violent, conduct.") (internal quotation marks omitted). As to whether the regulation constituted a rational means of furthering that interest, the Court observed that the regulation applied exclusively to inmates who, as a result of mental illness, "[were] gravely disabled or represent[ed] a significant danger to themselves or others," id. at 226, and that antipsychotic medication could be forcibly administered "for no purpose other than treatment, and only under the direction of a licensed psychiatrist," id.

The Court then conducted a detailed review of the procedural safeguards contained in the regulation. The Court observed that the regulation required that a determination to forcibly medicate an inmate be made in the context of an administrative hearing before a committee, none of the members of which were involved in the inmate's treatment and diagnosis. The Court further observed that the regulation provided the inmate with a variety of procedural safeguards before, during, and after the hearing. In particular, the inmate had the right to 24-hour notice of intent to convene the hearing, during which time he could not be forcibly medicated. He had the right to attend the hearing, to present evidence, and to cross-examine adverse witnesses. He also had the right "to the assistance of a lay advisor who [had] not been involved in his case and who [understood] the psychiatric issues involved." Id. at 216. If the committee rendered an adverse decision, the inmate had the right to submit an appeal within 24 hours to the superintendent of the institution, who was then obliged to decide the appeal within 24 hours of receipt. The inmate could then seek judicial review of an adverse decision by way of "a personal restraint petition or an extraordinary writ." Id. Lastly, after the initial hearing, the inmate could be forcibly medicated only with periodic review.

In concluding that the regulation's procedural safeguards comported with the requirements of due process, the Court necessarily rejected the procedural model urged by Harper. Although acknowledging that "[t]he forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty," id. at 229, the Court ultimately determined that, for purposes of due process, an inmate's interests "[were] adequately protected, and perhaps better served, by allowing the decision to medi-

13

cate to be made by medical professionals rather than a judge," id. at 231; see id. at 231-32 ("We cannot make the facile assumption that the patient's intentions, or a substituted judgment approximating those intentions, can be determined in a single judicial hearing apart from the realities of frequent and ongoing clinical observation by medical professionals."); see id. at 233 ("The risks associated with antipsychotic drugs are for the most part medical ones, best assessed by medical professionals. A State may conclude with good reason that a judicial hearing will not be as effective, as continuous, or as probing as administrative review using medical decisionmakers. We hold that due process requires no more.").

Lastly, the Court's conclusion as to the constitutional sufficiency of the regulation's procedural safeguards defeated Harper's alternative contention that due process entitled him to be represented by an attorney during the administrative proceeding. "Given the nature of the decision to be made," the Court determined,"the provision of an independent lay advisor who understands the psychiatric issues involved is sufficient protection." Id. at 236.

C.

Less than one week after deciding Harper, the Supreme Court denied the petition for a writ of certiorari in Charters, rather than summarily remanding the case for further consideration in light of Harper. See Charters v. United States, 494 U.S. 1016 (1990). Based upon that disposition, this court has indicated that the "professional judgment" standard established in Charters remains viable even after the Supreme Court's decision in Harper. See Hogan v. Carter, 85 F.3d 1113 (4th Cir. 1996) (en banc) (holding that state prison psychiatrist who authorized emergency medication of inmate was entitled to qualified immunity from inmate's § 1983 action). In any event, it is clear that application of either Charters or Harper would foreclose Morgan's effort to establish entitlement under the Due Process Clause to the type of judicial determination prescribed by the Sixth Circuit in Brandon.

First, under Charters, the determination of whether to forcibly medicate a pretrial detainee such as Morgan rests upon the professional judgment of institutional medical personnel, subject only to

14

judicial review for arbitrariness. See id. at 309. Absent any indication in the record that Springfield medical personnel failed to exercise professional judgment or otherwise acted arbitrarily in determining that Morgan should be forcibly medicated, our decision in Charters would compel the conclusion that the requirements of due process were satisfied below.

Second, were we to assume arguendo that Charters is no longer viable after Harper, Morgan would still not be constitutionally entitled to the judicial determination prescribed in Brandon. Springfield medical personnel, in determining that Morgan should be forcibly medicated, not only exercised professional judgment in making the decision, but also afforded Morgan an administrative hearing subject to the procedural safeguards mandated by the BOP under 28 C.F.R. § 549.43. This framework, which provides considerably greater procedural protection than would be required under Charters, see 863 F.2d at 312 ("Making an acceptable professional judgment of the sort here in issue does not require any internal adversarial hearing."), is virtually identical to the state framework at issue in Harper. Accordingly, we conclude that Morgan's due process rights were adequately protected below, in light of the administrative finding that treatment with antipsychotic medication is necessary because Morgan is dangerous to himself and to others at Springfield.

Under Harper, due process permits institutional medical personnel to forcibly treat a pretrial detainee with antipsychotic medication once they conduct the type of administrative proceeding the State of Washington employed and find that such treatment is necessary because the detainee is dangerous to himself or to others in the institutional setting. See id. at 227. We are confident that the Supreme Court's analysis regarding the reasonableness of the regulation upheld in Harper applies with equal force to the "dangerousness" component of 28 C.F.R. § 549.43(a)(5) (authorizing forcible treatment with antipsychotic medication when "necessary because the inmate is dangerous to self or others."). Indeed, the federal government has the same legitimate and important interest as do the states in combating a danger posed by an inmate to himself or to others in a prison, hospital, or other such institutional setting. See Bell v. Wolfish, 441 U.S. 520, 546 (1979) ("[M]aintaining institutional security and preserving internal order and discipline are essential goals that may require limitation

15

or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees."); Harper, 494 U.S. at 225 ("There are few cases in which the State's interest in combating the danger posed by a person to both himself and others is greater than in a prison environment, which, by definition, is made up of persons with a demonstrated proclivity for antisocial criminal, and often violent, conduct.") (internal quotation marks omitted).

Furthermore, under Harper, the administrative safeguards contained in 28 C.F.R. § 549.43 and the availability of judicial review for arbitrariness adequately protect the due process rights of a pretrial detainee for whom treatment with antipsychotic medication is necessary because he poses a danger to himself or to others in the institutional setting. As did the regulation upheld in Harper, § 549.43 requires that a determination of whether to forcibly medicate an inmate be made in the context of an administrative hearing. See 28 C.F.R. § 549.43(a). The inmate must be given 24-hour advance written notice of the hearing and be afforded the right to appear at the hearing, to present evidence, to be represented by a staff member, and to request that witnesses be questioned. See id. § 549.43(a)(2). The duties of conducting the hearing and of making the preliminary determination of whether to forcibly medicate the inmate are assigned to a psychiatrist who has not been involved in the diagnosis and treatment of the inmate at the time of the hearing, see id. §§ 549.43(a)(3), (5), thus assuring an independent decision maker, see Harper, 494 U.S. at 233 ("In particular, independence of the decisionmaker is addressed to our satisfaction by these procedures."). Moreover, the inmate is afforded the right to submit an appeal within 24 hours and to have the appeal decided within 24 hours of submission. See 28 C.F.R. § 549.43(a)(6). Although § 549.43 does not affirmatively grant an inmate the right to obtain judicial review of an administrative determination should his appeal be denied, we recognized in Charters that such a determination is subject to judicial review for arbitrariness. See Charters, 863 F.2d at 309. This standard of review is consistent with that contemplated in Harper, in which the Supreme Court highlighted the availability of judicial review in determining the procedural protections "necessary to ensure that the decision to medicate an inmate against his will is neither arbitrary nor erroneous." 494 U.S. at 228. The district court properly made such review available in the present matter.

16

D.

Morgan's claim of entitlement to the type of judicial determination prescribed by the Sixth Circuit in Brandon necessarily fails in light of our conclusion that his due process rights were adequately protected below. We note that Brandon, unlike the present matter, involved a situation in which institutional medical personnel sought to forcibly medicate a non-dangerous pretrial detainee solely to render him competent to stand trial. Indeed, the Sixth Circuit in Brandon suggested that its disposition was compelled by the absence of a finding that treatment with antipsychotic medication was necessary because Brandon posed a danger to himself or to others. See Brandon, 158 F.3d at 957 ("[T]he decision in the present case is whether to medicate a non-dangerous pretrial detainee in order to render him competent to stand trial, rather than to protect his safety or the safety of those around him while he is confined. The decision to be made here thus relates solely to trial administration rather than to prison administration.").

Presumably in an effort to liken the present case to Brandon, Morgan characterizes his case as one in which the government seeks to forcibly medicate him "mainly" to render him competent to stand trial. See Br. of Appellant at 15 ("This case involves a fundamental question about the power of the government to forcibly medicate a presumptively innocent person mainly for the purpose of bringing him to trial.") (emphasis added); id. ("The main governmental interest in this case is purely prosecutorial (making appellant competent to stand trial)."). The fact remains, however, that the finding that treatment with antipsychotic medication was necessary to render Morgan competent to stand trial was accompanied by a finding that such medication was necessary because he is dangerous to himself and to others at Springfield. Although Morgan provides us with no psychiatric evidence supporting a conclusion that the "dangerousness" finding was made arbitrarily, he essentially requests that we disregard that finding so that we may evaluate the constitutionality of permitting Springfield medical personnel to make the determination of whether to forcibly medicate him solely for the purpose of rendering him competent to stand trial. This we are unwilling to do.

We realize that forcibly medicating a pretrial detainee on the basis that such treatment is necessary because he is dangerous to himself

17

or to others in the institutional setting might have the incidental effect of rendering him competent to stand trial. However, if such an occurrence should come to pass in the present matter, Morgan would not simply be thrust into the courtroom for trial without additional procedural protections. Rather, he would be statutorily entitled to have a district judge conduct a pretrial examination of his competency to stand trial in the context of an evidentiary hearing, at which time he would be represented by counsel and permitted "to testify, to present evidence, to subpoena witnesses on his behalf, and to confront and cross-examine witnesses who appear at the hearing." 18 U.S.C. § 4247(d) (West 1985); see id. § 4241(e) ("The court shall hold a hearing, conducted pursuant to the provisions of section 4247(d), to determine the competency of the defendant."). Morgan could be brought to trial only if the government proved to the district judge by a preponderance of the evidence that Morgan was able to understand the nature and consequences of the proceedings against him and to assist properly in his defense. See id.§ 4241(e).

Assuming that the government succeeded in this regard, Morgan may be entitled to even further procedural protection should the government plan to forcibly medicate him at any point during trial. Specifically, due process would require the district judge to make findings as to the "need for" and "medical appropriateness of" such medication during trial. Riggins v. Nevada, 504 U.S. 127, 135 (1992). The district judge might also ensure that the medication posed no significant risk of altering or impairing Morgan's demeanor in a manner that would prejudice his capacity or willingness to either react to testimony at trial or to assist his counsel. See id. at 141 (Kennedy, J., concurring in the judgment). Given the extent of the foregoing procedural protections, we are assured that the government would be precluded from bringing Morgan to trial in a medicated state unless the constitutional implications of doing so were thoroughly considered in an appropriate judicial forum.

IV.

Although we reject Morgan's position that he was constitutionally entitled to the type of judicial determination prescribed by the Sixth Circuit in Brandon, we are nevertheless concerned because the record fails to disclose compliance with a key feature of the administrative

18

proceeding mandated by the BOP under 28 C.F.R. § 549.43. Specifically, by acceding to Morgan's request that Dye serve as his staff representative in the administrative proceeding, Springfield medical personnel may have contravened their affirmative obligation under § 549.43(a)(2) to ensure that Morgan was assisted by a staff representative with sufficient education and experience to understand the psychiatric issues involved in the proceeding.[3] Because the record on appeal provides no indication that Dye, a correctional officer, had the requisite credentials, we vacate the district court's order and remand for factual findings as to whether Dye did indeed have those credentials and, if not, whether Morgan suffered prejudice in the administrative proceeding as a result.

A.

In promulgating 28 C.F.R. § 549.43, the BOP mandated that certain steps be followed and established certain procedural benefits for inmates in the custody of the Attorney General facing the prospect of forcible medication. Of significance to this case is § 549.43(a)(2), which contains the requirement of a "staff representative."

Under § 549.43(a)(2), an inmate must be informed of his right to have a staff representative and be afforded the opportunity to request one. Institutional medical personnel, however, may not blindly accept an inmate's request for a particular staff representative or lack thereof. In fact, § 549.43(a)(2) directs that a staff representative be appointed for an inmate who either "does not request a staff representative, or requests a staff representative with insufficient experience or education," thereby ensuring that an inmate will not only have a representative, but that the representative in question will be one with sufficient education and experience. Although this section does not specify the requisite type or level of education and experience, we have no difficulty determining that, at the very least, the staff representative must have the ability to understand the psychiatric issues involved in the proceeding.

_____

[3] We recognize that this issue was not presented to the district court, but is one for which we requested additional briefing. We have authority under Hormel v. Helvering, 312 U.S. 552, 557 (1941), to reach this issue.

19

B.

A review of the administrative record in the present matter suggests that Springfield medical personnel may not have fulfilled their affirmative obligation under § 549.43(a)(2) to ensure the appointment of an individual with sufficient knowledge in the field of psychiatry to competently represent Morgan. Dr. Glazzard noted in his report that Morgan chose Dye, a correctional officer, to be his staff representative, but provided no information as to whether Dye had sufficient education or experience to serve as a staff representative. See 28 C.F.R. § 549.43(a)(2). Indeed, there is no indication at all in the administrative record that Dye had any education or experience in the field of psychiatry, let alone sufficient education and experience to understand the psychiatric issues involved in the administrative proceeding.

Furthermore, Dye's minimal participation during the administrative proceeding seems consistent with one who lacks a background in psychiatry because there is no evidence of any meaningful participation by Dye on Morgan's behalf. Rather, it appears that Dye's participation at the hearing was limited to testifying that "Mr. Morgan while interacting with others sings and talks inappropriately in the third person referring to himself as Ja'ai." J.A. 134. This statement indicates that Dye performed a function more akin to a lay witness than to one who possesses knowledge in the field of psychiatry.

Following the administrative hearing, Morgan received a copy of Dr. Glazzard's report, which did advise him of his right to submit an appeal within 24 hours and to have the appeal decided within 24 hours of submission. See 28 C.F.R. § 549.43(a)(6). The report did not, however, advise him of his right to request the assistance of his staff representative. See id. Forced to fend for himself again, Morgan submitted an appeal in the form of several rambling sentences. It appears that he did not learn of his right to request Dye's assistance with the appeal until the district court directed that he be permitted to supplement the appeal with such assistance. In the supplement, Morgan expressed concern regarding side effects of antipsychotic medication and asserted in conclusory fashion that he was not, as Dr. Glazzard had found, dangerous to himself or to others at Springfield. Lastly, Morgan declared that he was "not crazy" and was "ready to face the

20

charges." J.A. 130. These arguments, which provide no psychiatric basis to challenge the findings upon which Dr. Glazzard based his administrative determination, do not strike us as the product of one who has sufficient education and experience to serve as a staff representative.

C.

We have recognized that an agency's failure to afford an individual procedural safeguards required under its own regulations may result in the invalidation of the ultimate administrative determination. See, e.g., Delgado-Corea v. INS, 804 F.2d 261 (4th Cir. 1986). This principle is rooted in United States ex rel. Accardi v. Shaughnessy, 347 U.S. 260 (1954), in which the Supreme Court vacated a deportation order rendered by the Board of Immigration Appeals ("BIA") because the procedures leading to the order failed to comply with governing regulations promulgated by the Immigration and Naturalization Service ("INS"). The Accardi doctrine, as it has come to be known, has since been applied in a variety of contexts. See Service v. Dulles, 354 U.S. 363 (1957) (vacating discharge of Foreign Service Officer by Secretary of State); Yellin v. United States, 374 U.S. 109 (1963) (overturning conviction for contempt of Congress stemming from investigation conducted by House Committee on Un-American Activities); United States v. Heffner, 420 F.2d 809 (4th Cir. 1969) (overturning tax convictions obtained with use of statements obtained by Internal Revenue Service). The fact that a particular regulation or procedure is not mandated by the Constitution or by statute is of no moment for purposes of an analysis under the Accardi doctrine. See Service, 354 U.S. at 388 ("While it is of course true that . . . the Secretary was not obligated to impose upon himself these more rigorous substantive and procedural standards, . . . having done so he could not, so long as the Regulations remained unchanged, proceed without regard to them."); Heffner, 420 F.2d at 812 ("It is of no significance that the procedures or instructions which the IRS has established are more generous than the Constitution requires."). Although cases on this issue have generally addressed agency decisions outside the prison context, we believe that the principles apply equally here. Accordingly, once the BOP established the administrative framework set forth in § 549.43, Springfield medical personnel were bound to follow it.

21

Although the Accardi doctrine originally contemplated that an agency's failure to comply with its own rules would automatically nullify its action, see Heffner, 420 F.2d at 811 ("An agency of the government must scrupulously observe rules, regulations, or procedures which it has established. When it fails to do so, its action cannot stand and courts will strike it down."), the Supreme Court has since required that claimants demonstrate prejudice resulting from the violation unless "[t]he rules were not intended primarily to confer important procedural benefits upon individuals in the face of otherwise unfettered discretion" or unless "an agency required by rule to exercise independent discretion has failed to do so." American Farm Lines v. Black Ball Freight Serv., 397 U.S. 532, 538-39 (1970). Relying upon American Farm Lines, the Court of Appeals for the Ninth Circuit held that the INS's failure to follow its own regulations would not invalidate a deportation proceeding unless (1) "the regulation serves a purpose of benefit to the alien," and (2) "the violation prejudiced interests of the alien which were protected by the regulation." United States v. Calderon-Medina, 591 F.2d 529, 531 (9th Cir. 1979). The BIA subsequently adopted the Calderon-Medina prejudice framework, but made clear that prejudice might still be presumed under certain specific circumstances:

> Where compliance with the regulation is mandated by the Constitution, prejudice may be presumed. Similarly, where an entire procedural framework, designed to insure the fair processing of an action affecting an individual is created but then not followed by an agency, it can be deemed prejudicial. As a general rule, however, prejudice will have to be specifically demonstrated.

In re Garcia-Flores, 17 I. & N. Dec. 325, 329 (BIA 1980) (internal citation omitted). In Delgado-Corea, we spoke approvingly of this analysis. See Delgado-Corea, 804 F.2d at 263. However, because of the uncertainty which exists as to the qualifications of Dye to serve as an appropriate staff representative for Morgan and because resolution of the question could conceivably eliminate the question of prejudice, we decline to decide now the standard to be used to determine prejudice when a violation of § 549.43 occurs. This is an issue best resolved after a full development of the record.

22

V.

In summary, we are satisfied that Morgan's due process rights were adequately protected in the proceedings below. We therefore conclude that the Due Process Clause of the Fifth Amendment does not require that the determination of whether he should be forcibly treated with antipsychotic medication be made by a district judge as prescribed by the Sixth Circuit in Brandon.

However, the record does not sufficiently demonstrate that the administrative proceeding was conducted in compliance with 28 C.F.R. § 549.43. Specifically, Springfield medical personnel may have contravened their affirmative obligation to ensure that Morgan was assisted by a staff representative with sufficient education and experience to understand the psychiatric issues involved in the proceeding. Because the record on appeal does not indicate that Dye possessed the requisite psychiatric credentials, we vacate the district court's order and remand for factual findings as to whether he did indeed possess those credentials and, if not, whether Morgan suffered prejudice as a result.

VACATED AND REMANDED

23