115 F.Supp.2d 1132 (2000)
UNITED STATES of America, Plaintiff,
v.
Laura KEEVEN, Defendant.
No. 499CR0445SNL(MLM).
United States District Court, E.D. Missouri, Eastern Division.
August 24, 2000.
*1133 Janis C. Good, Federal Public Defender, St. Louis, MO, for Laura Keevan, defendant.
Thomas J. Mehan, Office of U.S. Atty., St. Louis, MO, for U.S.

MEMORANDUM AND ORDER OF UNITED STATES MAGISTRATE JUDGE
MEDLER, United States Magistrate Judge.
This matter is before the court for review of defendant, Laura Keeven's, appeal of the results of an administrative hearing held pursuant to 28 C.F.R. § 549.43 regarding the issue of defendant's involuntary medication because she is a danger to herself and others and in order to render her competent to stand trial.

Procedural Background
Defendant is a forty-two year old white female. She is charged by Indictment filed October 14, 1999 with Possession of a Firearm after having been previously convicted of the felony of Murder, Second Degree. On October 28, 1999, defendant made an initial appearance and counsel, Ms. Janis Good, was appointed. On October 29, 1999, defendant was arraigned. On November 19, 1999, the government made a motion for a psychiatric examination to determine the competency of defendant to stand trial and to determine whether she was insane on the date of the alleged offense. That same date, this court granted the motion pursuant to 18 U.S.C. §§ 4241 and 4242 and defendant was transported to the medical center for federal prisoners in Carswell, Texas ("FMC Carswell"). On February 18, 2000, the court received a Forensic Evaluation pursuant to 18 U.S.C. § 4247(b) and (c) from Dr. James A. Shadduck at FMC Carswell. The report, which is incorporated by reference, stated defendant's diagnosis to be Schizophrenia, Paranoid Type and Schizoid Personality Disorder (Premorbid). The examiner's prognosis was as follows:
Ms. Keeven's prognosis is poor. She clearly is suffering from a chronic and severe mental disease and has no insight into her condition. She had apparently responded positively to treatment efforts in the past, but she has been noncompliant with voluntary treatment recommendations. Ms. Keeven has been involuntarily hospitalized on two occasions and her symptoms of paranoid schizophrenia have become worse in the past two years. Her hallucinations and delusions caused her to engage in inappropriate and dangerous acts. Ms. Keeven is currently incapable of complying with voluntary treatment recommendations and without adequate treatment, her condition will continue to deteriorate. Ms. Keeven requires inpatient treatment, *1134 and she will likely need extensive monitoring and supervision for the foreseeable future. Without such steps, Ms. Keeven is likely to continue to behave in a dangerous manner.
Doctor Shadduck's Forensic Evaluation at 11-12.
The examiner concluded defendant is suffering from a severe mental disease which renders her mentally incompetent to the extent that she is unable to understand the nature and consequences of the proceedings against her or to assist properly in her defense. In addition, she was suffering from this severe mental disease at the time of the acts constituting the offense charged and as a result of this disease, defendant was unable to appreciate the nature, quality, and wrongfulness of her acts. Id. at 12.[1]
On February 29, 2000, defendant objected to the examiner's findings and moved for an independent psychiatric examination by a doctor selected by defendant's counsel. The court granted defendant's Motion and on May 30, 2000 received a Forensic Psychological Evaluation prepared by Dr. Richard G. Scott, which is incorporated by reference. Dr. Scott concluded that defendant suffers from Schizophrenia, Paranoid Type, Continuous. "The defendant presently manifests significant disturbances in the form and content of her thinking, prominent paranoia and delusions. She also may experience hallucinations." Dr. Scott's Forensic Psychological Examination at 4. Dr. Scott agreed with Dr. Shadduck that as a result of mental disease, the defendant lacks the capacity to understand the legal proceedings against her or to assist in her defense. Id.[2]
On June 2, 2000, the court held a Competency Hearing at which defendant was present and represented by counsel, Ms. *1135 Janis Good. The court took judicial notice of the reports of Drs. Shadduck and Scott. At the hearing, defendant appeared totally out of control. She shouted out repeatedly, insisted Ms. Good did not represent her and made scathing remarks concerning Ms. Good's representation and the court's authority. She made bizarre accusations of inhumane treatment she has received in the St. Louis County Justice Center. It was necessary that the United States Marshals restrain her when she became violent. From a thorough review of the forensic reports and the opinions contained therein, the court found by a preponderance of the evidence that defendant is presently suffering from a mental disease or defect rendering her mentally incompetent to the extent that she is unable to understand the nature and consequences of the proceedings against her or to assist properly in her defense.
Therefore, the court ordered pursuant to 18 U.S.C. § 4241(d) that defendant be committed to the custody of the Attorney General for hospitalization and treatment in a suitable facility for such reasonable period of time, not to exceed four (4) months as necessary to determine whether there is a substantial probability that in the foreseeable future she will attain the capacity to permit the trial to begin. The court further ordered:
IT IS FURTHER ORDERED that while hospitalized, the defendant shall receive medical and psychiatric treatment and medication if such treatment and medication is deemed appropriate by medical personnel at the facility, except that if defendant requires medical and psychiatric treatment and medication and if defendant objects and refuses such treatment and medication and is therefore entitled to an administrative hearing, that counsel is to be notified of the time and place of the administrative hearing, independent of her client. The director of the medical facility in which the defendant is hospitalized shall notify counsel as follows: Janis Good, Federal Public Defender, 1010 Market Street, Suite 200, St. Louis, Missouri 63101(314)241-1255.
Court Order Doc. # 26. Defendant was then returned to FMC Carswell. The medical staff and her treating physicians determined that she posed a danger to herself and others and that she required medication in order to control her symptoms. Defendant refused to consent to the medication. An administrative hearing was therefore necessary. Pursuant to 28 C.F.R. § 549.43(a)(1), which requires twenty-four hour advance written notice of the hearing, defendant was given a "Notice of Medication Hearing and Advisement of Rights" which stated in pertinent part:
Diagnosis: Schizophrenia, Paranoid Type
Proposed treatment: medication psychotropic
Reason for treatment: pt. is a danger to herself and
 others and does not respond
 to less restrictive interventions,
 e.g. counseling
The notice further advises defendant that she is entitled to be present at the hearing, to present evidence, to have a staff member to represent her, to call witnesses and to cross examine staff witnesses. The form indicates defendant did not desire witnesses and that she did not request a staff member to represent her. It states that Susan Beardsley, R.N. was appointed to represent her.[3] The notice is dated 7/14/00 and the hearing was scheduled for 7/17/00. Counsel for defendant was also notified pursuant to this court's Order and attended the hearing in spite of the fact that defendant indicated Ms. Good was not her lawyer and had been fired.[4] The Involuntary Medication Report issued after the hearing reviews the procedural safeguards and concludes that the defendant suffers from a mental disorder and does require psychotropic medication. The following reasons are indicated by check *1136 mark in a column marked "yes": she is dangerous to herself or others; she is gravely disabled; she is unable to function in open populations; in order to become competent for trial; is mentally ill and dangerous; and medication is necessary to treat the mental illness. The report indicates the specific information relied upon to support the findings was court records, the patient's medical records and patient interview. The involuntary medication was approved and justified on the grounds that "this patient is suffering from a profound psychosis resulting in loss of judgment, increased aggression and potential assaultive behavior." The report states that defendant was advised she could appeal the medication decision within twenty-four hours to the administrator of the mental health division, that the administrator had twenty-four hours to rule and that no medication would be given until the appeal was completed.
Defendant's counsel did appeal on defendant's behalf. The medication decision was affirmed. In anticipation of the affirmance, even before receiving the results of the appeal, defendant's counsel moved the court on July 19, 2000 for a judicial hearing prior to the administration of any involuntary medication and for the court to enjoin FMC Carswell from involuntarily medicating defendant until the court ruled on the motion.
On July 21, 2000, the court met with counsel for the government and for defendant. By this time, the affirmance had issued and involuntary medication had begun. Based on defendant's Motion and Memorandum in Support and the lack of opposition by the government, the court ordered that involuntary medication immediately cease, subject to the emergency provision of 28 C.F.R. § 549.43(b)[5]. It was, at that time, the intention of the court to schedule a judicial hearing as soon as practicable. Counsel for the government and defendant subsequently consulted with the court, briefed the issues and submitted pertinent affidavits and declarations which are docketed as # 29 and # 30 and are incorporated by reference.

DISCUSSION
It is not contested that a pretrial detainee retains a liberty interest in refusing treatment with anti-psychotic medication. See United States v. Morgan, 193 F.3d 252, 259 (4th Cir.1999) citing United States v. Charters, 863 F.2d 302 (4th Cir. 1988) (en banc). This interest "must yield to the legitimate government interests that are incidental to the basis for legal institutionalization," Id. at 305, but is nevertheless protected "against arbitrary and capricious actions by government officials," Id. at 306.[6] The Morgan court then reviewed the Charters' court's determination of what procedural protection is appropriate *1137 under the Due Process Clause, and concluded:
Ultimately, we concluded that the existing framework, under which the determination of whether to forcibly medicate an inmate was left to the professional judgment of institutional medical personnel and subject to judicial review only for arbitrariness, "[was] adequate, if properly administered, to comply with due process requirements." [Charters] at 312; see Id. ("making an acceptable professional judgment of the sort here in issue does not require any internal adversarial hearing.")
Morgan, 193 F.3d at 260
Counsel for defendant, relying on United States v. Brandon, 158 F.3d 947 (6th Cir.1998), argues that defendant has First, Fourth, Fifth and Sixth Amendment interests in avoiding forced medication and because of the Constitutional dimensions of her interests, she is entitled to a determination by a judge of whether she should be forcibly medicated. Brandon, unlike the present case, involved a situation in which institutional medical personnel sought to involuntarily medicate a non-dangerous pretrial detainee solely to render him competent to stand trial. The Brandon court held that under such circumstances the defendant was constitutionally entitled to greater protection than afforded by the administrative procedures delineated in 28 C.F.R. § 549.43 and further that due process prohibits such forcible medication unless a district court conducts an evidentiary hearing and finds by clear and convincing evidence that such treatment "is the least restrictive and least harmful means of satisfying the government's goal ... of rendering [the individual] competent to stand trial." Brandon, 158 F.3d at 960.
The court finds that Brandon is not on point in the instant situation. Here, the primary purpose for the medication of defendant is to manage and prevent her dangerousness. See Notice of Medication Hearing and Advisement of Rights ("reason for treatment: patient is a danger to herself and others and does not respond to less restrictive interventions, e.g. counseling"). The appropriate analysis is contained in United States v. Morgan, 193 F.3d 252 (4th Cir.1999), which held that a pretrial detainee was not entitled under the Due Process Clause to an evidentiary hearing before the district court prior to the forcible administration of anti-psychotic medication when the decision was based on the professional judgment of institutional medical personnel; the administrative hearing was subject to judicial review for arbitrariness. The Morgan court relied on United States v. Charters, 863 F.2d 302 (4th Cir.1988) (determination of whether to forcibly medicate a pretrial detainee found to be incompetent to stand trial and dangerous was best left to the professional judgment of institutional personnel subject to review only for arbitrariness) and Washington v. Harper, 494 U.S. 210, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990) (Supreme Court rejected due process challenge to procedural regime authorizing institutional medical personnel to forcibly medicate a state prison inmate without an evidentiary hearing by a judge).
In a Harper/Morgan/Charters analysis, this court must examine the record to determine whether the personnel at FMC Carswell complied with the procedural safeguards set out in 28 C.F.R. § 549.43 and whether the decision that defendant should be forcibly medicated was reached arbitrarily:
"Absent any indication in the record that [FMC Carswell] medical personnel failed to exercise professional judgment or otherwise acted arbitrarily in determining that [defendant] should be forcibly medicated, our decision in Charters would compel the conclusion that the requirements of due process were satisfied below.... Furthermore, under Harper, the administrative safeguards contained in 28 C.F.R. § 549.43 and the availability of judicial review for arbitrariness adequately protects the due process rights of a pretrial detainee for *1138 whom treatment with anti-psychotic medication is necessary because he poses a danger to himself or others in the institutional setting."
Morgan, 193 F.3d at 262-263.
First, the record is clear that defendant was not medicated prior to the hearing and received twenty-four hour written notice of the date, time, place and purpose of the hearing including the reasons for the medication proposal. 28 C.F.R. § 549.43(a) and (a)(1); Notice of Medication Hearing and Advisement of Rights. Defendant was told that the proposed treatment included the use of psychotropic medication. She was informed of her right to appear at the hearing, to present evidence, to have a staff representative, to request witnesses and to request that witnesses be questioned. 28 C.F.R. § 549.43(a)(2); Notice of Medication Hearing and Advisement of Rights. Defendant did not request a staff representative and thus the mental health personnel appointed a staff representative for her who had sufficient knowledge in the field of psychiatry to competently represent her. As noted above, Susan Beardsley is the nurse manager of the mental health in-patient unit. Id. In addition, counsel was notified as ordered by the court and was present at the hearing. The above procedures were confirmed at the hearing in writing and when Dr. Pederson attempted to give defendant a copy of the notice, she refused to accept it. Ms. Good's Affidavit at 2. Dr. Pederson told defendant the hearing was about her illness and that they wanted to medicate her. Id. It is not contested that the above procedures were followed.
Defendant's counsel argues however, that contrary to 28 C.F.R. § 549.43(a)(3), the hearing was not conducted by a psychiatrist who was not currently involved in the diagnosis or treatment of defendant. She argues that because Dr. Cherry was a psychiatrist on the staff of FMC Carswell and Dr. Pederson, the chief psychiatrist, is her supervisor, she was not an independent hearing officer. Dr. William Pederson, M.D., by declaration, states that he is chief psychiatrist at FMC Carswell and as such acts as treating physician for inmates with mental health concerns such as defendant. Dr. Judith Cherry, D.O., by declaration, states she is a staff psychiatrist at FMC Carswell, and one of her duties is to conduct administrative due process hearings. She states she is not directly involved in the diagnosis or treatment of defendant. She has met defendant when she was "on call" for all mental patients however, she is not defendant's treating psychiatrist. In addition to Dr. Pederson, Dr. James Shadduck, who wrote the forensic evaluation, was present at the hearing. Dr. Shadduck is supervised by Dr. Robert Gregg, Chief Psychologist. Also present were defendant's staff representative, a "Nurse Culver" and a "Ms. Stewart, Counselor". Ms. Good's Affidavit at ¶ 10.
The court finds that defendant's counsel's arguments on this issue are not well taken. There is no requirement in the regulation that the hearing officer be totally disconnected from the institution; it states merely "not currently involved in the diagnosis or treatment" of the inmate. The court finds Dr. Cherry was not so involved and thus qualified as the neutral hearing officer contemplated by the regulation.
Defendant's counsel also argues that 28 C.F.R. § 549.43(a)(4) was violated. This section requires that "the treating/evaluating psychiatrist/clinician must be present at the hearing and must present clinical data and background information relative to the need for medication ...", Counsel states that "it did not appear" that defendant's "treatment file or her assessment information was in the room at the time of the hearing." Ms. Good's Affidavit at ¶ 24. She states that "no one present read from/referred to/handled/or retrieved any document from a file during the proceeding". Id. It can reasonably be assumed that Dr. Cherry familiarized herself with the file prior to the hearing. *1139 Even if she did not, surely Drs. Pederson and Shadduck were sufficiently familiar with and prepared to present defendant's history and background without reference to a file. However, they were prevented from doing so by defendant herself. Ms. Good states in her Affidavit at ¶ 15: "Laura intermittently ranted about: her father, his death and his grave; Dr. Shadduck's apparent concern about the grave and the death of her father; her inability to get calls to her attorney; her father died on these medications; she does not want to take these medications; she believes that the prison is trying to kill her; she fell and received no treatment; she is allergic and has reactions to haldol and respiratol [sic]; she has asthma attacks and needs benadryl; and the prison killed her father."
Dr. Cherry states in her Declaration:
During the course of the medication hearing, I documented Ms. Keeven's responses. At the hearing, an attempt was made to present clinical data and background information to Ms. Keeven. However, it could not be presented as Ms. Keeven continually interrupted the proceedings, but she was provided with the clinical data and information regarding the need for treatment on several previous occasions. Ms. Keeven was grossly psychotic during the course of the medication hearing. She regularly interrupted staff members who attempted to present information. Ms. Keeven had loose associations, pressured speech and she believes that all of the proceedings were somehow related to the death of her father and that authorities at FMC Carswell were attempting to kill her.
I am informed that prior to the medication hearing, Ms. Keeven had numerous discussions with Dr. Pederson and other members of the medical health treatment in regard to the use of anti-psychotic medications. The benefits and potential side affects of these medications were explained to her on numerous occasions. Again, Ms. Keeven was argumentative and belligerent during most of these discussions....
Dr. Cherry's Declaration at ¶ 6 and ¶ 8.
Although defendant's counsel argues that clinical data and the need for medication was not presented at the hearing, the court finds that under the circumstances of defendant's own continuous outbursts and belligerence, to expect the medical staff to recite information to a non-receptive target is exalting form over substance. The staff attempted to present data and just as she did in the courtroom of the undersigned, defendant acted out to a degree not conducive to the exchange of information. 28 C.F.R. § 549.43(a)(4) was therefore satisfied. In addition, Dr. Cherry's Declaration notes that defendant was provided the clinical data and information regarding the need for medication on several previous occasions. Dr. Cherry's Declaration at ¶ 8.
Defendant's counsel also argues that at the hearing, defendant expressed her concerns about her treatment at FMC Carswell and stated that she suffers from allergies to many medications, including Haldol and Risperdal and that each causes her to suffer asthma attacks. Counsel implies that insufficient attention was paid to defendant's medical concerns. See defendant Keeven's Motion and Memorandum in Support Regarding Involuntary Psychiatric Treatment and Medication at 4. Dr. Pederson responds by declaration as follows:
Ms. Keeven has voiced concerns regarding allergies, asthma and allergic reactions to various types of psychiatric medications. In my professional opinion, I believe these concerns to be delusional. Ms. Keeven has been routinely evaluated by myself, physicians, nursing staff and physician assistants. She reports a myriad of physical and psychiatric complaints. Her physical complaints cannot be confirmed through routine physical assessment. Ms. Keeven appears to be an essentially healthy female. In addition, Ms. Keeven's mental *1140 and psychiatric records from her past have been carefully reviewed. Again, there is no evidence that Ms. Keeven is allergic to Haldol, Risperdal or any other psychiatric medication. In fact, on July 20, 2000, Ms. Keeven was administered an injection of Haldol and showed no signs of allergic reaction to the medication. Her complaints of asthma and other physical ailments are unfounded. Ms. Keeven has been given ample opportunity, both in the medication hearing and in numerous prior clinical interviews, to voice her concerns and objections regarding the recommended psychiatric treatment.
Ms. Keeven is a profoundly disturbed and psychotic woman who is experiencing paranoid delusions regarding mental health treatment in general and, in particular, the use of physcotropic medication.
Dr. Pederson's Declaration at ¶ 3 and ¶ 4.
The court finds that the medical staff did consider and evaluate defendant's expressed medical concerns. These concerns were definitely factored into the final determination that defendant, who is grossly psychotic, requires anti-psychotic medication:
It is my professional opinion that the use of anti-psychotic medications is appropriate and necessary in this case. Ms. Keeven's records and her current clinical condition have been closely reviewed and monitored. I believe there is no other known suitable or appropriate treatment for Ms. Keeven's mental disease or defect. Without such treatment, Ms. Keeven will continue to experience extreme agitation, paranoia, delusions, and be completely incapable of controlling her own behavior. In such a state, Ms. Keeven must be housed in the psychiatric seclusion unit. With appropriate treatment, there is a substantial probability that Ms. Keeven will experience a significant improvement in her clinical condition. It is only with appropriate psychiatric treatment including the use of anti-psychotic medications that Ms. Keeven can be provided the opportunity to become competent to stand trial. More important, without treatment Ms. Keeven will remain a danger to herself and others, will remain incompetent, and actively psychotic for the foreseeable future. I recommend that the treatment initiated on July 20, 2000 be reinstated so that Ms. Keeven may have the opportunity to recover from her profound mental illness.
Id. at ¶ 5.
Pursuant to 28 C.F.R. § 549.43(a)(5), Dr. Cherry prepared a written report and pursuant to (a)(6) of the regulation, defendant's appeal rights were fully explained to her. Involuntary Medication Report. Her lawyer appealed on her behalf to the institution mental health division administrator. Appeal of Involuntary Medication Decision. The appeal was denied and involuntary medication was commenced.
During the time the appeal was being processed, defendant's counsel moved this court for a stay of involuntary medication and a judicial hearing. The court stayed the involuntary medication and following conference with counsel for the government and defendant, determined that the appropriate review at this time was the review of the record for arbitrariness. See Morgan, 193 F.3d at 262.
The court finds that all of the procedural safeguards required by 28 C.F.R. § 549.43 were followed to the maximum extent possible under the circumstances of defendant's behavior due to her mental disease. The court further finds that the decision to involuntarily medicate defendant was not arbitrary but was based on the professional judgment of the medical staff at FMC Carswell finding defendant dangerous to herself or others in the institutional setting. Therefore, the defendant's due process rights were adequately protected. The court will therefore recommend that involuntary medication be re-instituted if it is still the professional judgment of the medical staff that it is necessary to control her dangerousness.
*1141 As set out above, however, the medical staff made the decision of the necessity for medication for reasons in addition to her dangerousness. Supra at 1136. Included in the reasons for medication were "in order to become competent for trial". The Morgan court dealt with this situation:
We realize that forcibly medicating a pretrial detainee on the basis that such treatment is necessary because he is dangerous to himself or others in the institutional setting might have the incidental effect of rendering him competent to stand trial. However, if such an occurrence should come to pass in the present matter, [defendant] would not simply be thrust into the courtroom for trial without additional procedural protections. Rather, he would be statutorily entitled to have a district [court] conduct a pretrial examination of his competency to stand trial in the context of an evidentiary hearing, at which time he would be represented by counsel and permitted "to testify to present evidence, to subpoena witnesses on his behalf, and to confront and cross examine witnesses who appear at the hearing." 18 U.S.C. § 4247(d) (West 1985); see Id. § 4241(e) ("The court shall hold a hearing conducted pursuant to the provisions of Section 4247(d), to determine the competency of the defendant.").
Morgan, 193 F.3d at 264.
This court previously held such a competency hearing and found defendant not to be competent to stand trial. In the event the presently ordered medication renders her competent in the opinion of the medical staff, she would clearly be entitled to another judicial hearing on this issue. Defendant could be brought to trial "only if the government proved to the [court] by a preponderance of the evidence that [defendant] was able to understand the nature and consequences of the proceedings against [her] and to assist properly in [her] defense." Morgan, 193 F.3d at 263; 18 U.S.C. § 4241(e).
An even greater problem looms on the horizon. As pointed out in Morgan, assuming the government succeeds in proving that defendant is competent to stand trial, the defendant may be entitled to more procedural protection should the government plan to forcibly medicate her during trial. "Specifically, due process would require the district [court] to make findings as to the `need for' and `medical appropriateness of such medication during trial." Morgan, 193 F.3d at 264 quoting Riggins v. Nevada, 504 U.S. 127, 135, 112 S.Ct. 1810, 118 L.Ed.2d 479 (1992); see also Papantony v. Hedrick, 215 F.3d 863, 865 (8th Cir.2000). The court would have to determine that medication during trial posed no significant risk of altering or impairing defendant's demeanor in a manner that would prejudice her capacity or willingness to either react to testimony at trial or to assist her lawyer. Id.; see also, in depth discussion of effect of medication during trial in Judge Tatel's concurrence in United States v. Weston, 206 F.3d 9, 1922 (D.C.Cir.2000).
Following any future judicial hearing at which the competency of defendant to stand trial is determined, the court will also at that time take up the issue of involuntary medication of defendant during trial.

CONCLUSION
The court finds that the procedural safeguards of 28 C.F.R. § 549.43 were followed and the medical staff at FMC Carswell's decision that involuntary medication was necessary to control defendant's dangerousness was not arbitrary but was based on sound medical judgment. Therefore, all the requirements of due process were met. Harper, 494 U.S. 210, 110 S.Ct. 1028, 108 L.Ed.2d 178; Morgan, 193 F.3d 252; Charters, 863 F.2d 302.
ACCORDINGLY,
IT IS HEREBY ORDERED that the medical staff at FMC Carswell may administer appropriate medication  involuntary medication if necessary  to defendant *1142 Laura Keeven in order to treat her dangerousness.
IT IS FURTHER ORDERED that the above Order be stayed for fourteen (14) days from the date of this Order to allow the defendant to request reconsideration by the United States District Court or to appeal to the United States Court of Appeals, if she so desires.
IT IS FURTHER ORDERED that if involuntary medication is commenced, the Director of FMC Carswell shall submit a report to the undersigned United States Magistrate Judge pursuant to 18 U.S.C. 4241(e) and 4247(c) no later than October 6, 2000.
NOTES
[1] Dr. Shadduck's Forensic Evaluation is replete with incidents of acts of violence by defendant. After reciting her delusional beliefs for several pages, he relates that she frequently called a crisis hotline number and then would hang up the phone. This prompted the hotline to notify the police who would then send an officer to the house to investigate. Upon arrival to her house, Ms. Keeven would assault the police and claim that it was they who had "beat and raped" her. On two of these occasions, she was taken to St. Anthony's Hospital for psychiatric treatment. "Each time she presented as violent and threatening with evidence of guardedness, paranoid delusions, pressured speech, homicidal ideation and poor insight and judgment." The records also indicate that Ms. Keeven behaved in a violent and threatening manner and due to her "agitated and endangering behavior", she was placed in restraints until medication could take effect. During her second admission to St. Anthony's Hospital, a request for involuntary commitment was made with statements as to her being dangerous to herself and others. The forensic evaluation continues that after her discharge from the hospital, Ms. Keeven began stalking and threatening hospital physicians and staff. In the instant offense, Ms. Keeven allegedly stopped her car in the middle of a busy street after which the police attempted to speak with her. However, she refused and told them that aliens were controlling her car with a remote control and had shut off the engine. Ms. Keeven then aimed a loaded gun and brandished a knife at the police and paramedic personnel at the scene.
[2] Dr. Scott's report also indicates defendant is prone to dangerous behavior. For example, she expressed significant hostility and distrust towards her attorney and did not accept the authority of the judge on her case. She stated that after she was committed to St. Anthony's, the treating psychiatrist signed a statement to have her raped four times a day. Her clinical insight and judgment were regarded as poor but defendant appeared unaware of the disturbances in her thinking and judgment. She has incorporated mental health professionals and her attorney into the conspiracy against her, viewing psychotropic medication as a means for sexually assaulting her. She explained the prior diagnosis of schizophrenia as a pejorative label given because she would not have sexual intercourse with her psychiatrist. Historically, she has shown a pattern of medication refusal and does not appear to understand how she Improves when adequately treated. In addition, when Dr. Scott examined Ms. Keeven, she was required to wear handcuffs during the the interview at the request of the shift leader on the unit at the St. Louis County Justice Center. She had been moved to the behavioral management unit from the infirmary because of continued behavioral problems necessitating restraint use in the prior weeks.
[3] Susan Beardsley is a nurse manager of the mental health in-patient unit.
[4] This is consistent with statements made by defendant about Ms. Good to both Dr. Shadduck and Dr. Scott. The court notes that Ms. Good has not requested nor been granted leave to withdraw.
[5] The court's Order required that in the event of an emergency situation, the FMC Carswell should immediately notify the court, the government and defendant's counsel giving names, phone numbers and fax numbers.
[6] Neither party nor the court has been able to locate Eighth Circuit law directly on point. However, in Papantony v. Hedrick, 215 F.3d 863 (8th Cir.2000) (a civil case filed by a prisoner at the Springfield Medical Center which the Court of Appeals construed as a Bivens action for damages), the Eighth Circuit cited Morgan with approval and ruled as follows on the issue of substantive due process:

A government official is immune from a Bivens suit unless the official's conduct violates a clearly established constitutional right. See Buckley v. Rogerson, 133 F.3d 1125, 1128 (8th Cir.1998). In Papantony's case the right is far from clearly established. In fact, Papantony as a pretrial detainee likely has no substantive due process right not to be forcibly administered anti-psychotic drugs to render him competent to stand trial. See Riggins v. Nevada, 504 U.S. 127, 112 S.Ct. 1810, 118 L.Ed.2d 479.... (1992) ... Finally, although we reject any remedy for Papantony at this time, circumstances could change and anti-psychotic drugs might eventually render Papantony competent to stand trial. If that occurs, this decision will not foreclose a future argument by Papantony that forced medication during trial violates his right to a fair trial. See generally United States v. Morgan, 193 F.3d 252 (4th Cir.1999).